We'll hear argument next in Case 12-414, Burt v. Titlow. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. No Court has ever held that AEDPA and Strickland can be satisfied by presumption based on a silent record. Yet that is precisely the approach the Sixth Circuit adopted in granting habeas relief here. The record doesn't say how Attorney Toca investigated or what advice Attorney Toca gave. Based on that record silence, the Sixth Circuit assumed Toca was ineffective. And under AEDPA and Strickland, the presumptions run the opposite way. Now, if there's one thing that the Court takes away from the oral argument this morning, I hope that it's this, how upside down the Sixth Circuit's analysis is when it says on page 19A of the petition appendix that Toca was deficient because the record contains no evidence that he advised Titlow about elements, evidence, or sentencing exposure. The correct question is whether the record contains evidence that Toca did not do those things and that record silence is dispositive in favor of the State on Habeas Review. Now, if we could pull the curtain back and see what really happened here, it may be the case that Toca gave the proper advice, that he advised Titlow about all the perils of going to trial, and that Titlow continued to maintain her innocence. Under Strickland, we're supposed to presume that Toca did exactly that, especially when it's Titlow's burden to satisfy the burden of proof, and she failed to do that. So I'd like to begin with our first issue, which is Edpa deference and the performance  Ginsburg-McGillivray-Miller May I just ask a question about what you just said? I mean, the record does show that Toca came into the case very late in the day. He asked to have a postponement because he said, I have to get up to speed. I don't know anything about this case. So Toca himself is saying, I'm not acquainted with the case. Well, I don't think he's saying that, Justice Ginsburg. He's saying, I'm not prepared for trial yet. But he says, I've got a lot of materials here. He goes through a very sophisticated sentencing analysis with the sentencing court in this plea withdrawal hearing. If you understand Michigan sentencing, if you've got a manslaughter charge, there's a grid and there's all kinds of different boxes that this could have fit into, and he would have had to have analyzed the evidence in order to determine that the 2-5 range was appropriate for a manslaughter conviction, and to be able to then negotiate with the prosecutor about whether that was or was not appropriate. And so we know that Toca did a lot of work. Was the sentence that was ultimately imposed after the trial for the second-degree murder conviction within the guidelines, within the Michigan guidelines? Yes, it was. Do you know what those guidelines were? I don't recall, but it's something on the range of 15 to 20 years. And when we're talking about guidelines, it's important for the Court to understand the difference between what the guidelines called for for manslaughter and what was in the plea agreement, because Michigan's got this indeterminate sentencing system where you've got a range for the lower end. And so the plea deal was 7 to 15 years on the lower end, and a manslaughter conviction, that is, if they had gone to trial and lost for manslaughter, that lower end was 2 years to 5 years. And so it was entirely reasonable, from an objective perspective, for an attorney looking at this record at the time the plea was withdrawn to say, yes, if you want to maintain your innocence, the most likely bad result at trial is most likely better than the plea deal that you already have. Sure, there's a risk that something worse could happen, but this Court has said in Strickland and Lafler and other places that bad predictions are not deficient performance. And so really when you get down to it, it's really a problem with both the advice being reasonable, but also the failure to carry the burden of proof. It's just the case that Titlow has not come forward to demonstrate, as he was required to do, she was required to do, on the record, what Titlow did or what Toca did to investigate and what advice Toca actually gave. Kennedy, when we're asking whether the advice was reasonable, what force do we give to the proposition that a well-counseled defendant was now insisting that he wanted to change his plea, and there was only three days, how do we factor that in? If we look just at what the counsel did, it may lead us to one answer, but if we know that a previously well-counseled defendant had now changed his mind and wanted to withdraw, how do we factor that in? I think that's a significant factor, because as you point out, before the ink was even dry on the plea agreement, Titlow was already in prison saying, I'm innocent, maybe I should be withdrawing this plea, setting in motion a chain of events that resulted in her firing the first attorney and then hiring a second attorney. And I don't think that the court of appeals, the Michigan court of appeals, articulated any kind of a per se rule about that. You know, certainly we all understand that the ethical obligation of the lawyer is that if your client insists that they want to maintain their innocence, you have to allow them to do that. But what the court of appeals did at pages 100 to 101A of the Petition Appendix, it looked at that, but it also looked at the other evidence. It looked at the Strickland presumption that Toka did his job, and then it says at the very conclusion of that sentence, based on all the proofs and arguments presented, Titlow failed to satisfy her burden. Innocence was one part of that. Alito, could you explain the procedural situation before the Michigan court of appeals? There was a motion by the Respondent for a remand to the trial court to create a record, is that correct, on the issue of ineffective assistance of counsel? And so the question that the court of appeals had to decide was whether the materials that were submitted by the Respondent were sufficient to justify the hearing. That's correct. The court of appeals, I gather, said they're not sufficient and cited, among other things or principally, the fact that the Respondent had claimed innocence and that was a reason for the change of attorney. So the issue really wasn't that was before them, was really not entitlement to relief. But in the course of deciding whether there should be a remand, they necessarily got to the issue of whether there was an entitlement to relief. Is that correct or do I'm not aware of this? Just to be clear about Michigan procedure, the Defendant has an opportunity to ask for what's called a Ginther hearing in Michigan, and that's this evidentiary hearing to develop a record for an ineffective assistance claim. Titlow did not ask for that hearing in the trial court. She did ask for it in the Michigan court of appeals. But under the Michigan court rules, this is 7.211C1A2, she was required to make a proffer to justify that hearing on this motion to remand. And so the court of appeals, before it issued its merits opinion, issues a one-sentence order that says that motion to remand is denied because you have not proffered enough evidence to demonstrate that a hearing is warranted. And that makes sense because the only proffer was the polygraph, the Lustig affidavit, and the Pearson affidavit. You know, it would have been entirely appropriate, this often happens, that Titlow herself would have submitted an affidavit saying this is what Titlow knew, or I'm sorry, this is what Toca knew, this is what Toca advised, and I relied on that. Or it sometimes is even the case that the previous defense counsel is willing to submit the affidavit that says this is what I knew, this is the advice that I gave. None of that was there. And so that's why you have this denial of the motion. So now in the context of that record and, Justice Kennedy, the claim of innocence and this whole thing being set in motion by that claim of innocence, it was quite of appeals to say that on the proofs presented and in light of the Strickland presumption, there was nothing objectively unreasonable about allowing Titlow to call her plea. Kaganer just thinking about that Michigan court of appeals decision, there's one sort of troubling line in it to me. It says, When a defendant proclaims his innocence, it is not objectively unreasonable to recommend that the defendant refrain from pleading guilty, no matter how good the deal may appear. And one way to read this is as a kind of categorical rule, which says that when a defendant says he's innocent, basically your obligations to properly advise him about a plea go away. Now, I understand you not to read it that way. So could you tell me a little bit about what you think of that question and why you read the sentence the way you read the sentence? Yes. I think it would be very difficult to defend the opinion if that was the only sentence of analysis, because we do not agree that a simple claim of innocence by your client relieves the attorney of any responsibility to do anything. That's not what happened here. Four sentences before the sentence you just read on page 101A, the court of appeals talks about the Strickland presumption that the attorney is doing his or her job. Two sentences after that sentence you just read on page 102A, the Michigan court of appeals specifically says on the proofs and arguments offered by a defendant, there's no ineffective assistance here. And so that was part of a larger discussion about attorneys who do their job when their clients are claiming innocence, and you have to put all that together. And I think it's significant also that the Michigan court of appeals was giving Titlow the benefit of the doubt here, because on page 100A, just one page earlier, it assumes Titlow's position, that is, that TOCA actually gave the advice to withdraw the plea. We don't even know that, because we don't have credible evidence in this record. We don't have an affidavit from Titlow. We don't have an affidavit from TOCA that indicates that TOCA ever gave that advice. Again, if you could draw the curtain back, it may very well have been, as we assume under Strickland, that he totally and completely advised about all the risks of trial before the plea was withdrawn. Breyer. Can you clarify something for me about habeas corpus law? Yes. I have to imagine the facts, so let's take it as a hypothetical. That the U.S. district attorney says, this lawyer was adequate, and really two factors make that obvious. The first factor is that the client said that she was innocent, and taking that into account with the other things, that could have justified adequately his withdrawal of the plea and not convincing her not to. Second, the sentence that the district attorney wanted to give was more than a year greater than the guidelines for manslaughter, and that could have justified it. Now, it writes, the Court then writes in its opinion only the second reason, and never mentions the first. Now we go to habeas, and the habeas court thinks that second reason is pretty flimsy there. Gee, she was exposing herself to murder, et cetera, pretty flimsy. The first isn't so bad, but they didn't rely on it. Okay. So now what is the habeas court supposed to do? Is it was the defendant have gone back to the State court first? Is the habeas court supposed to have its own independent hearing and make up its own mind? How does this work? That's a delightful question. No, I'm glad. I'd love to know the answer. And I want to start with a record response to distinguish our case from your hypothetical and then address the habeas question. Your hypothetical assumed that the State court only mentioned one of the two reasons. And here, obviously, the court of appeals talked about innocence. We've discussed that at length. But on page 100A of the opinion, the court of appeals also notes that the defendant moved to withdraw her plea because the agreed-upon sentence exceeded the sentencing guidelines range. So they're both here. But assuming your hypothetical, that we only had one and not two, the question is really easy under 2254, because so long as the decision was not a misapplication of this Court's clearly established precedent, there's no violation, even if their reasoning might not have been as strong as it could have been had they mentioned the other reason. So next habeas question, does the defendant get an opportunity to have a Federal habeas hearing to further develop the record about what happened? And the answer is no, because under 2254e1 and e2, there's a presumption of correctness about everything that was found in the State court system. And there's no right to get a Federal evidentiary hearing if you have not adequately pursued your ability to develop the record in the State court. And as Justice Alito has already pointed out, it was Titlow's failure, not the State's failure, to properly proffer evidence to get the Ginther hearing. Alito, what do you make of the fact that at the change of plea hearing, the first attorney didn't mention the claim of innocence, only mentioned the fact that the sentence was above the guidelines? I don't think that's significant, because those two things are not mutually exclusive. The defendant could believe in her heart of hearts that she's innocent, and at the same time, the attorney could acknowledge that there are facts in the record already admitted that a reasonable jury could conclude that you were guilty of manslaughter. And so it would not be inconsistent for that attorney to argue for a lower guidelines range in the plea. And so there's really nothing inconsistent about that. But the important thing to understand here is just the failure of the burden of proof. The Sixth Circuit is upside down when it reads into the record silence, ineffective assistance. Ginsburg. When you say the record is silence, I'm looking at the Joint Appendix, page 295, and this is Titlow's statement. I would have testified against my aunt had I not been persuaded to withdraw my plea agreement, because an attorney promised me he would represent me. He told me he could take my case to trial and win. So that sounds like she was persuaded by Mr. Toka to go to trial because she would win. And he had at that point not made any appraisal of the case. Well, first, I have to disagree with the premise of your question, Justice Ginsburg, because there's no doubt that Toka made an appraisal. He had, you know, the quote from the plea withdrawal hearing is, a lot of materials. And he made a very sophisticated argument about what the guidelines range should be, and that range was lower than the plea actually offered. But what you need to understand about this testimony from Titlow right here, this was a plea for leniency at sentencing. This was not part of the proffer to the Michigan Court of Appeals as part of the motion for remand. What Titlow could have done was submit her own affidavit or the affidavit from Toka establishing whether this was actually true or not. In addition, you've got to take the context of this and juxtapose it against the other things that Titlow is saying at this very same sentencing hearing. And it's remarkable, really, that she says both of these things. She says she feels sorry for her Aunt Billy for being this manipulating and evil person, and thanks God that she did not do what Billy asked her to do. And she says it was only because of her, Titlow, that the truth came out. So somehow it's still a claim of innocence, even after trial, even after there's been a conviction. If there are no further questions, I will reserve the balance of my time. Roberts. Thank you, counsel. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. There are two primary points that the United States would like to make. First, when evaluating Strickland prejudice in the context of a rejected plea offer, the statement of a convicted defendant that she would have accepted the plea, absent deficient advice, should be viewed with skepticism, and to support a finding of causation, the statement should be judged based on all the objective circumstances. Second, when a Federal habeas court finds a Sixth Amendment violation in the rejected plea context, it should not categorically require the government to reoffer a rejected plea deal. That decision should be left to the sentencing court, and requiring the government to reoffer a rejected plea deal in a context like this case, where the plea agreement required the defendant to do something other than plead guilty, give testimony against her aunt, it doesn't make sense, and the government should not be required to make the reoffer. Every defendant who rejects a plea offer and then is convicted after a trial will have an incentive and will want to revert back to a plea deal that she rejected beforehand. The statement of a convicted defendant that she would not have withdrawn her plea absent. Sotomayor, years ago, one of my colleagues, not on this bench, but a different one, said to me, you know, there's much to do about judges basing credibility on demeanor. And he said, no one does that. What you base it on is the internal consistency, logic of the testimony, and how it's corroborated by circumstances. And he said, otherwise, you just rarely hear anybody say, story makes sense, nothing corrupts, story doesn't make sense, the story's not corroborated, but the guy looks like he's telling the truth. I'm reading all the decisions that you cited for me, and not one, including  Every one of them is based on comparing the testimony to other factors, to logic, to evidence, to objective. So I don't know what rule it is, what objective evidence means. Do you need corroboration the way you need to prove a murder? Is that what you want us to announce? We're not asking for any kind of a special rule that there has to be, you know, a certain amount of corroborating evidence in addition to the defendant's statement. I do think it is just a general rule that you have to expand out to all the objective circumstances to evaluate the credibility of the defendant. And what the Sixth Circuit said in this case is, unlike some circuits, this Court does not require that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence. It said it, but it didn't do it. Well, to the extent that the Court was saying that the defendant's statement should be credited or not credited alone without necessarily looking at everything, that's wrong. And to the extent that it looked to other evidence in the record and to corroborating circumstances, the ones that it pointed to were too weak, and they were also very selective. The Court pointed to two things to support. Sotomayor, that's what juries do all the time, selectivity. That doesn't move me. What I want to know is, why do we announce a rule that somehow suggests a limitation that can't exist, meaning what judges look to to determine credibility relies on factors that you can't sum up in one word? All we're asking the Court to announce or to clarify on this question is that the subjective statement or the self-serving statement of a defendant in these circumstances should be viewed with skepticism, and that the Court should look to the other evidence in the record. Sotomayor, that's what juries do all the time, selectivity. Why do we announce a rule that somehow suggests a limitation that can't exist, meaning what judges look to to determine credibility relies on factors that you can't sum up in one word? All we're asking the Court to announce is that the subjective statement or the self-serving statement of a defendant in these circumstances should be viewed with skepticism That's a factor. And I guess we could have some situation, sometime, in some place, where a witness got on the stand and said something that was totally in his favor, but when you heard it, hmm, and you knew the case, hmm, he's right. And then that could happen with this kind of witness, too. It could happen. I'm not saying it very often does, but it could. So why should we have any special rule for these witnesses and not for any other? We are not asking for any kind of a special rule. We are just asking that the Court clarify, if it addresses the second question, that what the Sixth Circuit is saying, that you essentially, if you interpret it to mean that you don't have to look out to all the objective circumstances to determine the credibility of the defendant, that that's wrong. Roberts, Well, you need to give us some examples of things that don't count. I thought it was in your brief that you said, look, the fact that it turns out to have been a very bad deal. You know, the bargain was 1 year, and the sentence after Gildee was 20 years. That, I take it, you say is not a corroborating factor. O'Connell Not in this case. The disparity between the sentence that a person receives after the plea deal and the sentence that they receive after a trial is going to be present in every case. In fact, it has to be for prejudice. That could be a corroborating circumstance or something to support the defendant's statement in a case where, like some of the court of appeals' decisions, the defendant was misadvised on sentencing exposure. The lawyer said, well, you should reject this plea deal for 15 years because the maximum that you could get at trial is 20, and so it's worth the risk. But this defendant understood completely and said multiple times on the record that she understood that the potential sentence for a murder conviction was a life sentence and that that was back on the table if she withdrew the plea offer. Alito On the question of the sentence, what do you think were the range of reasonable sentences that could have been imposed in compliance with our recent decisions? You have the sentence that was offered before the trial, but that was predicated on, A, testimony, and, B, not having to go to trial. Then you have the sentence that was imposed after the trial when there was no testimony and there was a trial. What do you think a trial court could reasonably do in that situation, just split the difference? O'Connell Well, I think the trial court has a lot of discretion under the Court's opinion. But I think what should have happened in this circumstance is to go back to the sentencing court, not require the government to reoffer this plea deal, which just simply can't be offered and accepted anymore. In fact, in the record, when you see it being reoffered, they're saying we're offering manslaughter in exchange for her testimony at a trial that already happened. It doesn't make sense. In this case, there should be no reoffer. We should go based on the conviction after trial because of that. And perhaps there could be some kind of a reduction of the sentence within the district court's discretion. Ginsburg Why you made the point that this plea bargain could not be carried out once the number one condition, the prosecutor said, you testify against your aunt and then we'll give you this deal. Once the aunt is tried and she doesn't testify, there's no plea bargain. So why isn't that enough to decide this case, that you can't tell a prosecutor to renew a bargain that can't be carried out, that has become impossible? O'Connell Well, I mean, we think that's right. I don't know that it makes sense to say that because there's no remedy that the Court shouldn't address the first or second questions. I mean, maybe if the Court thinks that there's definitely no remedy and that this 20-to-40-year sentence should remain in place, but exactly. We don't think that the government should be required to reoffer the plea agreement in these circumstances. Kagan We're in a position now, aren't we, where the State court can do exactly that, can say the circumstances have changed and so leave everything undisturbed. O'Connell Yes. One of the problems here is that the Sixth Circuit sort of took as a given that in circumstances like this that the original plea offer has to be reoffered. And what we think the Court was saying in Lafler is that that's one thing that's on the table. It's not necessarily required in every case. There could be other creative remedies, like there could be a defendant who can no longer, who missed the opportunity to give the testimony she was supposed to give, but perhaps she has information on somebody else, and so maybe we could do a renegotiation of the plea. The Sixth Circuit, we do not think, should be just requiring, after it finds a Sixth Amendment violation, that the government reoffer a plea agreement in circumstances that are different from those in Lafler. Sotomayor But isn't the – I mean, the Court didn't say that the court below, the Sixth Circuit didn't say that the court below had to accept the reoffered plea agreement. It seemed inherent in Lafler and Frey that what the court was saying is that the court below has to use its judgment on whether accepting the plea is right or giving another remedy is right. All of these arguments should be before that court, not before us, as an absolute rule. That's right. And we simply think that the decision whether to require the government to reoffer it in the first place should also be something that's left up to the sentencing court to decide. Sotomayor So that's your only point, which is that that should be an issue for the court below. Yes. That this should all be left to the discretion of the sentencing court to come up with an adequate remedy. Sotomayor But some remedy has to be offered if there is a violation. The Court's opinion in Lafler, I think, leaves that question open, says that it could be the circumstances that the sentencing judge determines that the most fair result is to leave the conviction and the sentence in place, but the sentencing court has that discretion. Thank you. Roberts Ms. Newman. Ms. Newman Mr. Chief Justice, and may it please the Court, there is no question that the Michigan court of appeals erred and created an end run around Strickland in finding the professed that if a defendant professes innocence, that there is no need to look any further to say that defense counsel provided effective assistance.  He says there is nothing in this record to show what research was done or not done. The fact that the prior counsel's record wasn't reviewed doesn't say that he didn't talk to the prosecutor, doesn't say that he didn't look into other record evidence, any of the discovery that had been filed with court, or any of the other circumstances that could have informed him adequately. That's partially true, Justice Sotomayor. The record does show that at every turn when Mr. Toka stepped into the courtroom, he asked for more time and indicated he wasn't ready. The record does show that as soon as the plea was withdrawn, Mr. Toka said, I need more time, I'm not ready to go to trial, and in all fairness, my client deserves to have a fair trial, I'm not ready. If he's not ready to go to trial, he doesn't have a good handle on what the record is. My brother counsel makes an argument that Mr. Toka made a very sophisticated sentencing analysis and therefore had a grasp of the record. I would disagree with that interpretation of the record. Mr. Toka came in and said that the guidelines were 2 to 5 on the minimum sentence. The prosecutor said, I don't know what the guidelines are and I don't care. We don't even know if his recitation of what the guidelines range was was accurate. So there's nothing on this record to show that Mr. Toka even knew anything about the recitation. Alito, are you arguing that he needed to be he needed to have enough material and to have familiarized himself enough with everything that's relevant to the case to be able to go to trial before he could move to have the previous plea withdrawn? No, my argument does not go that far.  The defense counsel has a duty to investigate. The defense attorney has a duty to be able to inform the client of the risks of either accepting a plea, withdrawing a plea, whatever the case. In this case, it's withdrawing a plea that's already been accepted by the court. This is a very significant step in this matter. Well, that's true, but you have the duty or counsel for the defendant has the duty to show that counsel did not do that. It seems to me you're putting the burden on the other side to prove that the counsel knew all this. That's not the way the game is played. I agree with that, Justice Scalia. And we're not putting the burden on the other side. There is, if the – I will refer the Court to the Pearson Affidavit, which is in the Joint Appendix at page 298. That affidavit, in particular, paragraphs 6, 7, and 8, indicate that at an arbitration hearing where Ms. Titlow testified and Mr. Ott, our deputy sheriff's deputy Ott, testified, and at arbitration hearings witnesses are put under oath, and the affidavit is a sworn affidavit from an attorney. So it is a notarized affidavit from – about testimony that was taken under oath that indicates that Mr. Toka approached Ms. Titlow while she was in jail and while she was represented by counsel, that the approach was you should reject the plea and not testify against your aunt. That's the evidence that we have in the record, and that is not just Ms. Titlow. Kennedy, but just to be clear, isn't that after Titlow had asked for an attorney because Titlow had talked with the jailer who encouraged Titlow to plead innocent so this – so you have to include that preface to this statement, or it's quite incomplete. Or correct me if that's wrong. I would say that's wrong, and that's why the court of appeals was wrong again, and why the State court's findings are entitled to no deference. Because the State court took that affidavit from William Pearson and turned the words on its head. The affidavit does not state that Von Lee Titlow approached the sheriff's deputy and asked for a new attorney. The affidavit states that the sheriff's deputy approached her. He told her she should consult with his attorney because his attorney was really good, and his attorney would be able to help her. And so it's the sheriff's deputy unequivocally from this affidavit, because it's the only place that this evidence comes from, it's the sheriff's deputy – I'm sorry, were you looking – it's on page 298 of the joint appendix in William Pearson's affidavit. It's the sheriff's deputy that sets everything in motion about innocence. Why does he do that? Because he's in the courtroom when the plea is entered. And what is part of the plea? Part of the plea is that Von Lee Titlow passed a polygraph. Well, to a layperson, what does that mean? You passed a polygraph, you're innocent. You didn't do the crime. Well, in this case, that's not the situation at all. The passing of the polygraph cemented her guilt in participating in this crime. But what the – what she passed in the polygraph was that she was an aider and abetter. So it was her aunt who took the pillow and smothered her uncle, not Ms. Titlow. But she was present, she participated, she accepted money after the crime. So everything that happened in the Michigan court of appeals took the actual facts and turned them on its head, which is why the factual findings are not entitled to definition. Alito Isn't it – is it unreasonable to read the Pearson affidavit, and you submitted that, isn't that correct? Correct. All right. To read it to me that there were discussions between Deputy Ott and Titlow, and Titlow said she wasn't guilty. Ott said, well, if you're not guilty, you shouldn't plead guilty. I will refer you to an attorney if you want me to. I could ask somebody to come and talk to me. That seems to be a direct quote from – from Titlow, isn't that? So isn't it reasonable to read it that way? Justice Alito, that's one – part of what you said I would agree with, that the – it does state in the affidavit, certainly, that he had an attorney that was really good and could ask somebody to come talk to me. But the rest of the statements, I would argue, are inferences and not fact. And we have facts in the affidavit. Breyer, there has to be some evidence. You're saying that the court was wrong when they said, your client, said she wasn't guilty. Now, this affidavit doesn't show that. I mean, paragraph 6 doesn't say who spoke first, but common sense suggests that the deputy sheriff wouldn't have made that statement unless she spoke first. I mean, does he go around saying to everybody just generally, oh, you know, if you're not guilty, you shouldn't plead guilty? I mean, it says they had discussions, and during the discussions, he told her she shouldn't plead guilty if she wasn't guilty. It also says, with all due respect, that the deputy approached her. Approached her and discussions with her. It doesn't say why he approached her. I mean, I just don't think people normally do that. They go to every person in jail and say, you know, if you're not guilty, you shouldn't plead guilty. I mean, somebody might, but something triggered that advice. And the affidavit doesn't tell me what triggered that advice. So I could infer that what triggered the advice was her statement she wasn't guilty, or I could infer this is an unusual situation where for some reason unknown he brought it up. I don't know from reading paragraph 6. So whose burden is it? Justice Breyer, I would argue that it's an inference that doesn't matter. It's in this case. It doesn't matter. Why doesn't it matter? Because if she went, she said, you know, I'm not really guilty, he said, well, you shouldn't plead guilty. She said, but I have a lawyer that will get rid of your guilty plea if it went something like that. And then we assume the lawyer was told about this. It doesn't say. It's a reasonable assumption. And then the court opinion of the Michigan seems to make sense, that that was a reason. That was one of the reasons that made his conduct in withdrawing the plea or, you know, not strongly advising her against it. That was one reason why that wasn't an inadequate assistance of counsel.  In paragraph 8 of William Pearson's affidavit on page 298, it indicates that it was Frederick Toca who encouraged her to reject the plea agreement to testify against the aunt. So again, we have the attorney who is not Ms. Titlow who is saying, I want to withdraw my plea. It's the attorney who is saying to her and encouraging her to reject a plea. Now, I'm going to ask you, Ms. Newman, you know, I'm — this may be the first case that I've been involved in as a judge, and there might be others, but myself personally, where in a situation like this, the defendant has not put in an affidavit to explain what happened. There is some force to your adversary's argument that there's a really sparse record here. And epidefference requires the burden on you. You can't deny that. I guess, I don't know if you were responsible, but what are the circumstances that would occasion a defendant not saying, this is what I was told? Newman, I was not the attorney. I came into the case at this level. So I did not do any of the litigation below. However, there are — there is record evidence to support not — there is record evidence that supports the claim, and maybe it was a strategic decision by the attorney not to submit other affidavits because the attorney was simply looking for a hearing to expand the record. So we have both — Sotomayor, but they didn't ask for the hearing in the court below. They only asked for it at the court of appeals. They — Michigan — Michigan — the way Michigan works is within 56 days of getting the transcripts, you can file in the trial court. If you fail to make that 56-day deadline, then your alternative is to go to the court of appeals and ask for a remand. So we don't know when the case got to the attorney. So I don't think that there's any inference that can be drawn from the fact that within that very short time period, there was no motion filed in the trial court. Alito, who was the attorney at that stage? I take it it wasn't the trial attorney, because a big part of the claim before the Michigan court of appeals was that the trial attorney was also ineffective. Right. Who was it? It was an appellate attorney, Liz Jacobs, was the attorney at that stage. And she's — is she with your office, or she's in a — She's not with my office, no. But she was appointed. She was — I don't know if she was appointed or retained, but she's not with my office. May I ask you, Ms. Newman, if you would agree that the Sixth Circuit was wrong at least to this extent, is there — what is the argument for directing a prosecutor to make a plea offer that was never previously made? The offer that was made is impossible to carry out now. The offer was conditioned on her testimony at her aunt's trial. That didn't happen. So there is no — is no plea bargain offered, and yet the Court instructs a renewal, instructs the prosecutor to renew an offer that doesn't exist. Well, Justice Ginsburg, as the Court decided last term in Lafler v. Cooper, the point of the remedy is to put the defendant as closely as possible back in the position he or she would have been in but for the ineffective assistance. In Lafler v. Cooper, the Court recognized that there's going to be situations where circumstances have changed and there's going to be circumstances where that is not possible to do that exactly. In this case, of course, she cannot testify against her aunt because her aunt was acquitted and is deceased. However — But how could the Court order the prosecutor to renew an offer that can't be made? Well, it is an offer that can be made if you remove the conditioned precedent. So the offer that — the premise of the offer is a charge reduction. But the whole — what drove the prosecutor to make this bargain was he wanted the testimony. So how can that — I've never seen anything like this, where a court orders a prosecutor to make a plea offer that was never made. Well, again, referring to Lafler v. Cooper, the remedy goes — the Sixth Amendment right attaches to the defendant, not to the prosecution. So the goal here is to remedy, if the Court finds and agrees that there's a Sixth Amendment violation. If there's an unequal burden to be borne by one side or the other, it has to be borne by the government. And so, therefore, the way to remedy the Sixth Amendment violation, it was a charge reduction, is to reoffer the manslaughter plea, which has already been done in this case, by the way. My client has already accepted that plea. And then it's up to the trial court now whether or not to accept the plea, reject the plea, or do some sort of modification, which is exactly what the Sixth Circuit ordered and is exactly what this Court ordered in Lafler v. Cooper, to allow the trial court to have the discretion in fashioning a remedy that both will take care of the Sixth Amendment violation and can balance the concerns of the prosecution and what's been lost in that process, but still be able to craft a remedy. Scalia. I don't know that it's so strange to make the prosecution submit an offer that can no longer be accepted. I mean, it doesn't seem to me any more strange than to make the prosecution submit an offer where the situation was at the beginning, you do this and I won't you know, I won't prosecute. The quid pro quo was you avoid the possibility of conviction. But here she's already been convicted. She had a trial, you know, by 12 fair, impartial jurors, and she was guilty. That's what the jury found. So it seems to me just as strange to make the prosecution, now that we know she's guilty, submit that prior offer. So, I mean, it seems to me quite weird in any event. So one incremental weirdness is not so bad. Ms. Scalia, though, I think you hit the point on the head. She was always guilty. And as my brother Counsel stated, this case in some ways is very, very similar to Cooper. You have comments on the record by Frederick Toka that the prosecution has made comments and they reference this in the appendix. They reference a newspaper article. The prosecutor talks about the fact that this is nothing more than a manslaughter case. This is, we're charging first-degree murder, but really it's sort of a, in sheep's clothing, it's really just manslaughter. And Frederick Toka is saying on the record this is just a manslaughter case. Why should my client accept an above-guideline sentence of a 7-year minimum and have to testify against a co-defendant? She's going to go to trial and the prosecutor has already admitted this is nothing more than a manslaughter case. So she'll be convicted of manslaughter and she's going to be in a better position following trial and conviction. Just like in Cooper, there was no question Mr. Cooper was going to be convicted. There was no question at all. The defense counsel gave the same advice. You can't be convicted of a charged offense. You're going to be convicted of a lesser offense. And following that conviction, you will be in a better position for sentencing than you will be with this plea. If the facts are in all fours. Alito, your arguments seem to be, have had a head-on collision. If this is nothing but a manslaughter case, then why was, what argument do you have that Toka was ineffective in saying let's go to trial, so if you convicted a manslaughter without the plea, you'll get your guideline sentence on the manslaughter case? Because for the same reason in Cooper, he was absolutely wrong and he was not aware of the evidence that had been marshaled against Ms. Titlow, including her office special. So I thought you were just saying it's a manslaughter case. I'm saying that his representations on the record are similar to the representations made by Mr. Cooper's attorney on the record. That you will, in response to just the case, she was convicted of second-degree murder, right? She was convicted of second-degree murder. And in this case, in Cooper, the defense attorney never filed a motion to quash. So he never challenged the legal sufficiency of the evidence. In this case, attorney number one, Mr. Lustig, did file a motion to quash. He tested the sufficiency, the legal sufficiency of the prosecution's case for first-degree murder. So there was no question. Alito You have my head spinning. I thought you were making the argument that there's nothing unfair about requiring acceptance of, about the imposition of a manslaughter sentence because this was a manslaughter case. I thought you were making that argument. Did I misunderstand that? I'm not making that argument. I thought you were. There is a reason that they spoke about, which was, well, she said she was innocent. Now, as to that one, what they wrote is the record discloses that the second attorney's advice was set in motion by defendant's statement to the sheriff's deputy that he did not commit the offense. You say that's just contrary to fact, as you point to the affidavit. The affidavit I read, I think, is rather ambiguous in that respect, and I can overturn that, or a Federal court can, only if this factual statement I just read you is clearly wrong, clearly. So I have a tough time saying it's clearly. And I know they overstated, because they said automatically, that's good. Well, that may be an overstatement. You have to read it in light of that sentence. But then you're making a second argument, I take it, if this is right. Your second argument is, anyway, he was incompetent for a completely different reason. He didn't read the record. And if he'd read it, he never would have made the statement that this is just a manslaughter case. He would have seen that if she withdrew her guilty plea, she'd be tried for murder, and then she'd get a really long sentence. So that's an ineffective assistance of counsel. Now, what does the Court in Michigan say about that? Nothing. Nothing. So now I wonder, maybe nobody made that argument to them. Or maybe they made it and they rejected it sub silentio. That's why I asked my first question. Okay? So, Ann, you heard the response. Even if they had heard that argument and they said nothing about it, they don't have to mention every argument made. If they just deny, we assume they deny it. And what we do is see whether they were within their rights to deny it. That's how we're supposed to look at it. Does it clearly violate Supreme Court law to deny it? And there's going to be a factual part of that and a legal part. All right. How do we deal with that? Well, 2254 gives the separate provisions for the legal aspect of that. Well, first of all, did anybody make the argument as clearly as you have made it? I saw what it was, I think. So did anybody make that argument to the Michigan court? Not that I'm aware of. Okay. Well, that's the end of that, isn't it? I mean, what you're coming or you have to proceed by asking for reopening in the Michigan court and then see if they say it's too late and then, you know, et cetera. They're all spelled out in this opinion, which I can't remember, Cullen or Pinholzer or something. And this isn't an argument for us now. It's just a factual argument trying to respond to the Court's questions about what happened in this case and about what is contained in the record and what Mr. Toka did say on the record. Roberts If I could move beyond the particular facts to some of the broader points that the Solicitor General has raised, if you don't have the requirement of at least some corroboration, then all you have in every case is a completely self-serving assertion. I wouldn't have pled guilty if, you know, I had known this or I had known that. And everybody will raise that argument. Everybody raises ineffective assistance of counsel anyway. And they'll just add on to it this plea assertion. I mean, shouldn't it be the Sixth Circuit really went out of its way in saying there's no requirement of corroboration at all? Kagan Mr. Chief Justice, there's no question the Sixth Circuit in dicta said that we don't require it, but it exists in this case. And the reality is, as we discussed in our brief, that every circuit looks at the Strickland analysis, just like every other Strickland analysis. The court looks at the entire record and makes a determination based on the record. And this Court has always eschewed hard, fast, bright-line rules in terms of telling courts what has to exist in order to make a specific point. Roberts So you think the Sixth Circuit was wrong in what you're characterizing as dicta? You think it was wrong to say that? And that the other circuits which require something in addition, that that's the rule that we should adopt? Kagan I don't think, no, I don't think that any particular rule should be adopted. I think the rules that exist under Strickland are fine for the circuits. The rules have existed for decades, and the circuits have no trouble figuring out when the threshold is met and when it's not. Roberts Well, I thought, maybe I'm misremembering, but the Sixth Circuit distanced itself from the other circuits, didn't it? Kagan Yes. It did distance itself by State court. Roberts Well, now you're telling me the circuits have always done this. So the Sixth Circuit, at least, thinks it's doing something different. Kagan It may think it's doing something different, but in this particular case, there was objective evidence that they pointed to. And as the Solicitor General mentioned, there's always going to be sentencing disparity because you're going to have to have a sentencing disparity in order to show prejudice. So in effect, there will always be objective evidence that will support any subjective statement of a criminal defendant, or you're never going to be able to believe the prejudice. And if you have objective evidence, that's like saying you don't have to have corroboration. Kagan Right, but for this Court — my point is, obviously, the Court can set forth a rule. But in doing so, I think we're going to run into what Justice Sotomayor said earlier in terms of judges do this all the time. They figure out who's credible. I mean, it's never just like, here's these things, but this guy's credible, so I'm going to believe him. It's a totality of the circumstances, and it's always going to have to be a totality of the circumstances. So to say, here's the line, there has to be objective evidence, then what is the objective evidence? How are we going to define objective evidence? Roberts So the Sixth Circuit was wrong when it said, we're doing something different than the other circuits. Kagan They certainly did not do anything different in this case. In the other cases that I've reviewed from the Sixth Circuit, I've not seen a case that relied only on subjective testimony. So I can't point to a case where the Sixth Circuit is doing something different than any other case, and I don't believe anyone else has pointed to a particular case. So they might think they're doing something different, but in reality, they're doing the same thing as everybody else. Alito Can I ask you about Mr. Toka's ethical lapses? Are they – do they have a legal significance in this case? I certainly speak to his credibility in United States v. Soto Lopez. There's a very similar case out of the Ninth Circuit, where the Court did rely on the fact that the attorney had significant problems, ethical problems. And in this case, Mr. Toka's actions and his ethical problems go hand in hand. I mean, he approached a representative defendant who was in jail and encouraged her to reject a plea. He did this on a very short timeline, admitting that – well, not admitting, but we know from prior counsel that he had not even picked up the phone to speak with prior counsel, who had spent almost a year litigating this case. He had not retrieved prior counsel's file. It appears from the record – those are facts. In terms of inferences, it appears from the record that he got his information from the media, from – this was a highly, highly publicized case. He signed a retainer agreement with a client who had no money, who gave him some jewelry and the right to promote her story. So he had every – he violated multiple ethical rules, and those violations lead to the conclusion, a reasonable conclusion, that the reason for withdrawing the plea was to make the deal more lucrative. It's not lucrative if she pleads, and she had already pled. So she had already entered a plea, and all that was left was sentencing. That's not a very exciting story if your entire retainer agreement relies on the fact that you have the media rights to sell the story. So, yes, I would argue that the ethical lapses are very significant in this case and lend credibility to – Well, in what sense is his credibility – did his credibility figure in the decision of the Michigan Court of Appeals? Well, it didn't. There were separate issues raised on ethical violations, and they were denied by the Michigan Court of Appeals, and they were denied by the Federal court. Do you know whether the Michigan court was ever presented with this argument that, in fact, he gave the advice he did because of the peculiar fee arrangement that he had? They were specifically presented with the conflict argument. And off the top of my head, I apologize. I don't recall if that is specifically contained in there, but I think it was. I mean, there was – it was definitely briefed and argued, the ethical violations. And Mr. Toca now, remind me, disbarred for forever, for – Yes. He committed multiple misdemeanors and a felony, and in part was disbarred based on his conduct in this case. So he's no longer practicing law. Last I checked, he's no longer practicing law anywhere in the United States. What was submitted to the Michigan Court of Appeals? Not the – I'm not talking about the exhibits that were attached, but there was a motion, a brief, what was it? Yes. There's a – it's called – in Michigan, it's called a motion to remand. You're required under the court rules to submit a brief in support of that motion to remand, and you're required to submit a proffer. So the proffer – It's not in the – it's not in the habeas record. It's not in the record of the Federal court, and we've been unable to get it from the State court, but it does exist? Yes. It's a motion? Absolutely. Yeah. You have to file a – you have to file a motion to remand, and the court of appeals specifically references that motion to remand and the – and the proffer by the affidavits in stating that normally they wouldn't consider those – the proffer as substantive evidence, but in this case, inexplicably, they did, which leads to another reason why the Michigan Court of Appeals' decision is unreasonable, because it's the Michigan Court of Appeals that failed to engage in further fact-finding. And so we take the record as we get it from them, and under Williams and other decisions, if the court is the one that's responsible for an inadequate record, I mean, we have what we have, and I would argue to this Court that the record that we have supports that the Michigan Court of Appeals erred both legally and factually in its findings, and therefore, neither are entitled to any deference. And the Sixth Circuit's habeas grant should be affirmed in this matter. Are there no further questions? Thank you, Your Honor. Roberts, Mr. Bursch, you have four minutes remaining. Thank you, Mr. Chief Justice. A few clean-up points. Starting with this idea that the factual predicate was wrong. As we explained in our briefing, in the habeas pleadings in this very case, Titlow already conceded that the factual predicate was correct. And, Justice Breyer, you asked about the quantum of proof necessary to overcome that assumption the court of appeals made based on the record before it. And actually, the legal standard under AEDPA is not clearly wrong. Under 2254e1, which is reprinted in our blue brief, it's presumed correct, and that presumption can only be overcome by clear and convincing evidence, and we don't have that here. Second, with respect to the advice, my friend on the other side points to paragraph 8 of the Pearson affidavit, and it's a little ironic that they put all their eggs in that basket now, because in their briefing they disclaim it as triple heresy and say this Court should not rely on it. And she said some things characterizing that paragraph that aren't in there. There's nothing in paragraph 8 or the rest of the affidavit that says Toka approached Titlow. I don't know where that comes from. But assume that everything that she says is correct and that Toka did give the advice to withdraw the plea. That still doesn't mean that it's bad advice when you apply the AEDPA and Strickland rubrics, because as Justice Alito pointed out, the differentiation in the manslaughter guidelines and what was actually in the plea actually makes this objectively reasonable advice. And in fact, it's more than that, because at the time that the plea was withdrawn, consider all the facts that were known from talking to the prosecutor, looking in the police file and everything else that Toka presumably did. At that time, no one knew about this critical Shaheen testimony, which only came out at trial, that it was actually Titlow who held Uncle Don down while he was being smothered. I mean, that completely changes the complexion of this case. And so to say that Titlow was always guilty when all of her testimony up to the point of the plea withdrawal had been, I told my Aunt Billy to stop and then I left the scene, that's just not credible. Point on the second issue, the prejudice prong, Chief Justice Roberts and Justice Sotomayor, you note that the other circuits all look at objective evidence and we think that's the right way to approach this. And you're exactly right, Chief Justice, that the Sixth Circuit takes a different approach. The Sixth Circuit says, although some circuits have held that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence, we in this circuit have declined to adopt such a requirement. And you can see how that difference played out in this very case, because the Sixth Circuit didn't look at all the other evidence that was in the record that was contrary to this self-serving statement that Titlow made, that Titlow had the plea in hand and before the ink was even dry was already professing innocence and talking to other lawyers, that she fired Lustig and there was no reason to do that unless she wanted to withdraw the plea, that she did not have a propensity for truthfulness. At trial she lied about the fact that she was drunk when she was not the night of the murder. The evidence came out that she asked Shaheen to lie about the alibi and she hid the murder weapon. And then you've got all these statements at the sentencing hearing and post-remand where she's continually asserting her innocence. It's happening all the time. When you consider all that objectively under the other circuit standards, clearly that would not be sufficient to establish prejudice here. That's the objective evidence. Sotomayor, I don't understand what you're saying. The other side says, and I think it's the standard, that you look at the totality of the circumstance. Correct. And what you're saying is they didn't do that here. It's not that they used some objective evidence. You're saying they didn't use other objective evidence. I am. Here's the connector, Justice Sotomayor. The reason they didn't look at the other evidence is because they have a different rule. They don't think they have to look at it. They did look at things like sentencing disparity, as the Solicitor General's office explained, that shouldn't come into play here because that was a well-known disparity. It wasn't something that was hidden by clients in effective assistance. And they – the Sixth Circuit talks about the fact that she accepted the plea once and then withdrew it. Obviously, that cuts both ways. So all you're left with is the subjective testimony. And when you look at all the other objective evidence, the evidence that other circuits would look at, there's really only one possible outcome here. So in sum, Your Honors – oh, I guess I do want to mention one other quick point since my light hasn't gone yet. The book deal, there was no book deal. Look at page joint appendix 60, and I've seen copyright assignments that wasn't the case here. They were trying to raise money for the trial. And this case had nothing to do with the reason why Toca was disbarred. That's at joint appendix 302 to 317. It was because he falsely put someone else's license tabs on his license plate, and that was a misdemeanor, and then he lied about it. In sum, record silence under Edpun Strickland means the State wins, not the convicted murderer. Thank you. Roberts.